**Dated: March 24, 2023**

**The following is ORDERED:**



Sarah A Hall
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JERRY WAYNE NOLES, | ) | Case No. 22-11808-SAH |
| | ) | Chapter 7 |
| Debtor. | ) | |
| ——————————————— | ) | |
| | ) | |
| MYERS OPERATIONS, INC., AND | ) | |
| 2016 MOBILE WATER SYSTEMS 1, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adv. Pro. 22-01058-SAH |
| | ) | |
| JERRY WAYNE NOLES, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER GRANTING IN PART, AND DENYING IN PART,
### DEFENDANT'S SECOND MOTION TO DISMISS WITH BRIEF
### IN SUPPORT AND NOTICE OF OPPORTUNITY FOR HEARING [DOC. 15]

Before the Court are: (i) Defendant's Second Motion to Dismiss with Brief in Support

and Notice of Opportunity for Hearing [Doc. 15] (the "Motion"), filed by defendant Jerry Wayne

Noles ("Defendant") on February 9, 2023; (ii) Plaintiffs' Response and Objection to Defendant's

Second Motion to Dismiss [Doc. No. 15] and Brief in Support [Doc. 16] (the "Response"), filed by plaintiffs Myers Operations, Inc. ("Myers") and 2016 Mobile Water Systems I, LLC ("MWSI"; Myers and MWSI collectively, "Plaintiffs") on February 22, 2023.  In the Motion, Defendant seeks dismissal of Plaintiffs' Second Amended Complaint to Determine Dischargeablity of Debt [Doc. 14], filed on January 26, 2023 (the "Amended Complaint").[1]

## BACKGROUND

Plaintiffs and Defendant entered into a contract in February 2016 for the purchase of equipment to be used in the oil and gas industry.  The equipment was purportedly designed, tested, and manufactured by Defendant and utilized a new technology to treat and clarify water produced through hydraulic fracturing – fracking – of a hydrocarbon-bearing formation.  The relationship soon turned sour, however, when Defendant unilaterally changed the equipment to be purchased and increased the purchase price.  Inevitably, litigation ensued.  Plaintiffs prevailed and now seek to have the debt owed them declared non-dischargeable.

## JURISDICTION

The Court has jurisdiction to hear the Motion pursuant to 28 U.S.C. § 1334(b), and venue is proper pursuant to 28 U.S.C. § 1409.  Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a), and this is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(I).

---

[1] The Amended Complaint was filed pursuant to the Order Denying Motion to Dismiss with Brief in Support and Notice of Opportunity for Hearing [Doc. 9] and Directing Plaintiffs to File an Amended Complaint [Doc. 12], entered on January 13, 2023, to clarify its claims and provide a more definite statement of the fact allegations supporting the elements of their Section 523(a)(2)(A), (4), and (6) claims in the body of the Amended Complaint.

## STANDARDS GOVERNING RULE 12(b)(6) MOTIONS TO DISMISS

A plaintiff bears the burden to frame a complaint with enough facts to suggest he or she is entitled to relief.  Robbins v. Oklahoma ex rel. Okla. Dep't of Human Servs., 519 F.3d 1242, 1247 (10th Cir. 2008).  To survive a motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure, made applicable here pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure, "a plaintiff must include in the complaint 'enough facts to state a claim to relief that is plausible on its face.'"  Barenburg v. Burton (In re Burton), 2010 WL 3422584, at *2 (10th Cir. 2010) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  This standard requires that factual allegations contained in an adversary complaint be sufficient to raise a right to relief above mere speculation.  Twombly, 550 U.S. at 555; see also, Ridge at Red Hawk, 493 F.3d at 1177 (stating complaint must give the court reason to believe the plaintiff has a reasonable likelihood of mustering factual support for the claims raised).

The Tenth Circuit has interpreted "plausibility," the term used by the Supreme Court in Twombly, to "refer to the scope of the allegations in a complaint" rather than to mean "likely to be true."  Robbins, 519 F.3d at 1247.  Thus, "if [allegations] are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible."  Robbins, 519 F.3d at 1247 (internal quotations omitted).  "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief."  Robbins, 519 F.3d at 1247.  "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them."  Robbins, 519 F.3d at 1248.  The Tenth Circuit has

instructed "the degree of specificity necessary to establish plausibility and fair notice, and

therefore the need to include sufficient factual allegations, depends on context" and whether a

defendant receives fair notice "depends on the type of case." Robbins, 519 F.3d at 1248.

Additionally, claims for fraud must satisfy the heightened pleading standard of Federal

Rule of Civil Procedure 9(b), applicable to adversary proceedings pursuant to Federal Rule of

Bankruptcy Procedure 7009.  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must

state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(a).

## APPLICABLE BANKRUPTCY CODE SECTIONS

The claims raised in the Amended Complaint are made pursuant to the following

provisions of 11 U.S.C. § 523(a)(2), (4) and (6).[2]  Section 523(a)(2)(A), (4) and (6) provide:

> (a) A discharge under section 727, 1141, 1192, 1228(a), 1228(b),
> or 1328(b) of this title does not discharge an individual debtor from
> any debt–
> . . .
>
> (2)    for money, property, services, or an extension, renewal, or
>        refinancing of credit, to the extent obtained by—
>
>        (A)    false pretenses, a false representation, or actual fraud,
>               other than a statement respecting the debtor's or an
>               insider's financial condition;
> . . .
>
> (4)    for fraud or defalcation while acting in a fiduciary capacity,
>        embezzlement, or larceny;
> . . .
>
> (6)    for willful and malicious injury by the debtor to another entity
>        or to the property of another entity.

---

[2]Unless otherwise indicated, hereafter all references to sections are to the Bankruptcy
Code, Title 11 of the United States Code.

4

## STATEMENT OF FACTS FROM COMPLAINT

On a motion to dismiss, the Court must accept the "well-pleaded allegations of the [Amended Complaint] as true and view them in the light most favorable" to Plaintiff.  Albers v. Bd. of Cnty. Comm'rs, 771 F.3d 697, 700 (10th Cir. 2014).  Despite the present procedural posture, both parties attempt to present the Court with extraneous facts to consider.  Motion 1-2, 9-10; Response 2, Ex. 1 (Affidavit of Sam L. Stein).  However, as counsel for Plaintiffs and Defendant are well aware, the Court must ignore all new fact allegations contained in the Motion and the Response as the Court can accept only the fact allegations of the Amended Complaint. Earles v. Cleveland, 418 F.Supp.3d 879, 893 (W.D. Okla. 2019) (court disregarded allegations raised for first time in response to a motion to dismiss); Salopek, Tr. for Salopek Fam. Heritage Tr. v. Zurich Am. Life Ins. Co., 428 F.Supp.3d 609, 617 (D. N.M. 2019); In re Qwest Commc'ns Int'l Inc., 396 F.Supp.2d 1178, 1202 (D. Colo. 2004).  Plaintiffs' and Defendant's extraneous facts serve only to distract the Court and will be disregarded.

1.      Defendant filed a chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Western District of Oklahoma on August 15, 2022.  The first meeting of creditors was conducted on October 4, 2022.

2.      Plaintiffs are creditors of Defendant pursuant to a judgment ("Judgment") entered in the 467th District Court in and for Denton County, Texas (the "Texas Court") on January 24, 2022, in Case No. 17-7027-393 (the "Texas Case").

3.      Coil Chem Water Technologies, LLC (hereinafter, "Coil Chem") is a defendant named in the Judgment.

4.     The Judgment represents a judgment for fraud, conversion (including statutory theft), negligent misrepresentation, and common law fraud by Defendant against Plaintiffs. A copy of the Judgment is attached to the Amended Complaint as Exhibit 1.

5.     The Judgment was entered based upon an Order Entering Findings of Fact and Conclusions of Law which was signed by the trial judge and filed in the Denton County Court on October 19, 2021 (the "Order"), at the conclusion of the non-jury trial.  A copy of the Order is attached to the Amended Complaint as Exhibit 2.

6.     The underlying facts which gave rise to the Texas Case being filed in Denton County, Texas, involved the sale by Coil Chem to Plaintiffs, of "Mobile Water Clarification Units" (the "MWC Units") incorporating a type of water treatment and clarification technology which Coil Chem was utilizing in the oil and gas industry.

7.     Robert W. "Bob" Myers ("Bob Myers") was first introduced to Defendant in late 2015 by a friend who was an employee of an affiliate of Coil Chem (called, Coil Chem, LLC). The friend knew that Bob Myers had a background in raising investment capital and asked him if he might be able to help Defendant raise additional capital for Coil Chem either through debt financing or venture capital infusion.

8.     Bob Myers agreed to meet with Defendant.  At a meeting arranged in late 2015, Defendant informed Bob Myers that Defendant was looking for additional funding to expand the use of Coil Chem's water treatment and clarification processes in the oil and gas industry by building a system to utilize the technology and processes for industry users in a mobile and transportable form.

9.      The Coil Chem water treatment and clarification process was represented by Defendant to be a cost effective and reliable alternative to conventional, onsite water disposal and/or treatment processes then utilized in the industry, by providing a means to recycle water for later use in drilling and completion operations.

10.     Different types or classes of "water" are involved in the drilling or completion of oil and gas wells.  For example:

A.  "Produced water" refers to water that has been "produced" from an oil and gas well in the process of extracting the hydrocarbons. "Produced water" originates from hydrocarbon-bearing formations originally associated with oceanic sea beds and simply refers to the "seawater or saltwater" trapped within the underground reservoir which gets produced along with the hydrocarbons.

B.  "Flowback water," on the other hand, results following the hydraulic fracturing ("Fracking") of a hydrocarbon-bearing formation [eg., shale] from which hydrocarbons are freed and then captured, resulting in the "flow back" of water that is located at the interface between the hydrocarbon-bearing formation and the well bore itself. The Fracking fluid that is used to accomplish the fracturing of the hydrocarbon-bearing formation is "flowed back" out of the well during this "well completion" process, and recovered – hence, the name "flow back" water.

C.  "Fresh water" refers to "artesian type water" that comes from the ground, gets stored in a pond, aquifer or lagoon built to hold it at the well site, after being pumped out of the ground or from nearby rivers, creeks or other moving water source.

11.     The Coil Chem water treatment and clarification process was represented by Defendant, as a process to treat and clean-up (clarify) "produced water" so the water could be recycled for later use in Fracking operations integral to the development of shale oil reservoirs.

12.     Coil Chem's water treatment and clarification technology was represented by Defendant as utilizing either:  (a) a chemical oxidation process that incorporated hydrogen peroxide

7

as the oxidizer to promote cavitation, kill bacteria, and aid in the removal of solids; or
(b) an aeration oxidation process (via the use of blowers and aerators) to increase oxygen
levels in the water to aid bacteria in the aerobic digestion of solids.

13.    Negotiations took place between Myers and Defendant in late 2015 and early 2016 for
Myers to help raise the capital Defendant wanted for expanding Coil Chem's operations
for the treatment and clarification of water in the oil and gas industry.

14.    The negotiations between Myers and Defendant mutated from possibly creating a separate
entity through which investment capital could be raised, to Myers securing third party
investors who would purchase the MWC Units from Coil Chem, while Defendant and
Coil Chem's affiliate, Coil Chem, LLC, would secure industry placement for the units
and service them, with operating revenues to be split on a pre-arranged formula between
Myers and Coil Chem.

15.    Defendant represented to Myers that Coil Chem's water treatment and clarification
process had been designed and tested by him and Coil Chem.  Defendant even provided
information to Myers on two different well site locations where Coil Chem's water
treatment and clarification process was being utilized by Samson Energy Company (the
"Samson Site") and the Brigham Resources, LLC's "Salty Brigham 10 15W Location" in
Pecos County, Texas (the "Brigham Site").

16.    Defendant represented to Myers that the revenues being generated by Coil Chem for
treating and clarifying "produced water" for use in Fracking operations on both the
Samson Site and Brigham Site, came to "around $90,000.00 per month."

17.     In reliance upon the statements and representations Defendant made to Myers about the Coil Chem water treatment and clarification technology and the advantages and profitability of utilizing that technology in the oil and gas industry, an agreement dated February 1, 2016, was signed for Myers (and later, MWS1) to purchase from Coil Chem, MWC Units incorporating Coil Chem's chemical oxidation process (the "Contract").

18.     Bob Myers signed the Contract on behalf of Myers as its President, and Defendant signed the Contract on behalf of Coil Chem as its CEO.

19.     An addendum attached to the Contract as "Attachment B Initial Agreement" and incorporated by reference into the Contract was also signed by Bob Myers on behalf of Myers – but signed by Defendant on behalf of a purported entity called "Coil Chem, Inc."

20.     At the time the Contract was signed, there were multiple limited liability companies registered with the Oklahoma and Texas Secretaries of State utilizing "Coil Chem" as part of the entity's name, but no entity existed named Coil Chem, Inc.

21.     Coil Chem, Inc., was an assumed name under which Defendant individually signed the Addendum, making Defendant a party to the Contract.

22.     The Contract granted Myers the right to purchase from Coil Chem five (5) MWC Units upon completion of each unit in accordance with the terms and conditions of the Contract at a per unit price of $510,836.19.

**The Creation and Involvement of MWS1**

23.     In reliance upon the statements and representations Defendant made to Myers about the Coil Chem water treatment and clarification technology and the advantages of utilizing a

9

mobile treatment technology in the oil and gas industry, Myers sought and obtained investors with whom it formed an affiliated company, MWS1.

24.  MWS1 was formed in March of 2016 to facilitate the purchase and deployment of the MWC Units under the Contract, as contemplated and agreed to by Myers and Defendant.

25.  Bob Myers is, and was for all relevant times, the Manager of the limited liability company, MWS1.

26.  The Contract obligated Defendant to supply to Myers (at Myers' option) additional MWC Units at the per unit price of $510,836.19.

27.  Individual members of MWS1 met with Defendant, who reaffirmed to those individuals the statements and representations earlier made to Myers by Defendant about the Coil Chem water treatment and clarification technology and process, and the advantages of utilizing mobile units in the field to generate the same income stream Coil Chem was seeing from the Samson Site and Brigham Site.  According to Defendant, the whole objective behind building a mobile treatment platform was to forego the infrastructure associated with both of those types of operations.

28.  In reliance upon statements and representations which Defendant made to MWS1, MWS1 supplied the funds through Myers for the purchase of the first three (3) MWC Units under the Contract.

29.  On May 16, 2016, Defendant for the first time disclosed to Myers that he had decided to utilize a "Super Oxidizer" system rather than the hydrogen peroxide system, because it would handle higher volumes and be easier to move from site to site – would be more mobile.

30.  Defendant falsely represented to Myers the Super Oxidizer system as "better, faster and more profitable" than the oxidation process utilizing hydrogen peroxide which had originally been explained to Myers and was shown to him during a visit to the Brigham Site.

31.  By representing to Bob Myers that the Super Oxidizer system was "better, faster and more profitable" than the chemical oxidation process utilizing hydrogen peroxide, Defendant falsely represented to Myers and MWS1 both the industry acceptance and profitability of utilizing this particular style of mobile water treatment technology and equipment for treating and clarifying water to be recycled for use in Fracking operations.

32.  Myers had already relied upon the representation by Defendant that Coil Chem was generating revenues of $90,000.00 per month for recycling water for use in Fracking operations when Myers signed the Contract on February 1, 2016.

33.  Following the May 16, 2016 meeting, Myers began passing on to potential investors the profit potential of the Coil Chem water treatment and clarification technology and process, as represented to him by Defendant.

34.  Myers relied upon the representations by Defendant that Coil Chem was generating revenues of $90,000.00 per month, in recycling water for use in Fracking operations when he formed MWS1 and when he talked to potential investors who became members of MWS1.

35.  In June of 2016, Defendant provided Myers and MWS1 with Coil Chem's production and financial records in an effort to substantiate the $90,000.00 per month revenue stream Myers could expect per well site for recycling water to be used in Fracking operations.

Those production and financial records, however, falsely represented the production capabilities and profitability of the Super Oxidizer units.

36.     By mid-July 2016, when Myers was expecting to get an invoice for the first MWC Unit, Myers was told by Coil Chem the unit price would be $640,000.00 instead of $510,836.19 as provided in the Contract.

37.     Myers did not understand at the time why the per unit price had increased over the stated Contract price. Myers, therefore, refused to pay the higher per unit price of $640,000.00.

38.     Defendant unilaterally substituted supplying a Kria Industrial Ionizer (dubbed by Defendant as a Super Oxidizer) under the Contract with Myers and falsely represented to Myers the super oxidation system was "better, faster and more profitable" than Coil Chem's existing systems or technology utilized at the Samson Site and Brigham Site.

39.     Unbeknownst to Myers at the time, Defendant did not manufacture the Super Oxidizers that were to be sold to Myers.

40.     Although the Contract specified the sale to Myers of a mobile unit at $510,836.19 utilizing Coil Chem's existing water treatment and clarification technology, Defendant's substitution of the Kria Industrial Ionizer (dubbed the Super Oxidizer) meant that Coil Chem now needed $640,000.00 per unit to purchase the completed units from a supplier rather than Defendant manufacturing the units in-house.

41.     MWS1 (through Myers) paid only the sum of $510,836.18[3] for the first MWC Unit (the first of the Super Oxidizers) in the following payments to Coil Chem:

_____

[3]The payments listed here amount to $390,836.20, and the sum above appears to be a miscalculation. However, the miscalculation does not affect the Court's analysis.

    a.      on July 19, 2016, MWS1 paid Coil Chem $150,000.00;

    b.      on September 16, 2016, MWS1 paid Coil Chem $140,000.00;

    c.      on December 8, 2016, MWS1 paid Coil Chem $100,836.19.

42.    Myers' (and MWS1's) refusal to pay the increased per unit price of $640,000.00 led to Defendant seeking to secretly disengage from Myers under the Contract. This disengagement effort involved Defendant embarking upon a scheme to secure money from Myers and MWS1, and the investors of MWS1, to beta test the Super Oxidizer units in the field with end users such as Energen Resources Corporation ("Energen") and Brigham Resources, LLC.

43.    This scheme also involved Defendant forming Coil Chem-MWT Partners Joint Venture (the "Joint Venture") to raise capital through private placement offerings of membership interests in MWT Partners, LLC to fund the exclusive purchase by MWT Partners, of mobile water clarification units (the Super Oxidizers) for Coil Chem, LLC to manage and operate, and the joint venture to profit from.

44.    Unbeknownst to Myers and MWS1 until after they paid the final installment on the first MWC Unit, Defendant (through Coil Chem, LLC) signed (or caused to be signed) a lease agreement with Energen dated July 11, 2016, to lease the first Super Oxidizer unit to Energen for use on an Energen well site near Tarzan, Texas, (the "Energen Lease"), essentially to beta test the unit on a water pit stockpiling aquifer water, generating only $19,000.00 per month in lease payments – nowhere near the $90,000.00 per month Coil Chem had represented to Myers it was generating in revenues from the Samson and Brigham Sites treating "produced water" recycled for use in Fracking operations.

45.   By September of 2016 and unbeknownst to Myers and MWS1, MWT Partners, LLC was

actively soliciting investment dollars to market "Mobile Water Treatment" solutions to

the oil and gas industry, utilizing the Kria Industrial Ionizer (dubbed the Super Oxidizer),

while Defendant continued to furnish unaudited financial information to Myers and

MWS1 reflecting revenues of $90,000.00 per month for treating "produced water"

recycled for use in Fracking operations, without disclosing the fact that Defendant had

entered into the Energen Lease at only $19,000.00 per month for placement of the first

Super Oxidizer unit.

46.   Periodically throughout 2016 and continuing to January 10, 2017, and in reliance upon

the misleading production and financial information Defendant was furnishing, MWS1

advanced to Coil Chem the sum of $885,836.19 for the purchase of the first three MWC

Units specified under the Contract.

47.   MWSI advanced money to Defendant in reliance upon Defendant representing that the

MWC Units (the Super Oxidizers) were capable of treating and clarifying produced water

to be recycled for use in fracturing operations.

48.   Defendant fraudulently concealed from Myers and MWSI the revenue stream to be

generated by the Energen Lease of the first Super Oxidizer, in order to convince Myers

and MWSI to pay significant sums of money to Defendant.

49.   Defendant used the funds paid by MWSI for his own personal gain rather than as

intended by the Contract.  This occurred in the late spring of 2017 after MWSI had

advanced the sum of $350,000.00 toward the purchase of the second and third MWC

Units (the Super Oxidizers) and after Myers and MWSI had learned of the Energen Lease

14

and of the $19,000.00 per month revenue stream from that lease. Myers demanded assurances from Defendant that future placement of MWC Units would be for treating and clarifying produced water on well sites, to be recycled for use in Fracking operations – withholding the advancement of any additional funds under the Contract until those assurances were made.

50.    Rather than provide the assurances demanded by Myers, Defendant purportedly cancelled the Contract with Myers, failed to refund the $350,000.00 advanced by MWSI as a down payment for the purchase of the second and third Super Oxidizers, and secured a commercial loan through Coil Chem, LLC to fund the remaining purchase price for those units in its own name.

51.    In order to cash flow the resulting loan payments for the foregoing commercial loan, Defendant converted to his own use and benefit the remaining Energen Lease payments from the first MWC Unit (the first Super Oxidizer). Defendant collected money from Energen and failed to account for and share said funds with Myers and MWSI as provided by the Contract.

52.    In addition or in the alternative, Defendant usurped and diverted to his own use and benefit, revenues generated by the placement of the first MWC Unit (the first Super Oxidizer)[4] delivered to Energen, instead of accounting for and sharing said funds with Myers and MWSI.

---

[4]Plaintiffs refer to the mobile water clarification units as both the MWC Units and later as the Super Oxidizers. For the sake of clarity, the Court will refer to the units as MWC Units throughout the legal analysis when discussing the mobile water clarification units under the Contract, and refer to Super Oxidizers when discussing the technology employed.

15

53.   In addition or in the alternative, Defendant intentionally prevented Myers and MWSI

from having access to various lease payments paid by Energen and retained by Defendant,

who unlawfully appropriated the same to his own use in derogation of the rights of Myers

and MWSI, and did so without their consent.

## ANALYSIS AND CONCLUSIONS

In a complaint, a plaintiff is not required, nor expected, to state specific facts proving

each element of the claims so long as fair notice of the claims and the grounds upon which they

rest are set forth.  Higginbottom v. Mid-Del School District, 2016 WL 951691, at *1 n.1 (W.D.

Okla. 2016); Harris v. Chevron U.S.A., Inc., 2015 WL 3746989, at *1 (W.D. Okla. 2015).  A

complaint must allege facts which allow the court to believe plaintiff has a reasonable likelihood

of mustering factual support for the stated claims.  Higginbottom, 2016 WL 951691, at *2

(quoting Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)).

"Granting a motion to dismiss is 'a harsh remedy which must be cautiously studied, not only to

effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice.'"

Higginbottom, 2016 WL 951691, *2 (quoting Dias v. City & Cnty. of Denver, 567 F.3d 1169,

1178 (10th Cir. 2009)).  Thus, "a well-pleaded complaint may proceed even if it strikes a savvy

judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote

and unlikely.'"  Sanchez v. Hartley, 810 F.3d 750, 755 (10th Cir. 2016) (quoting Twombly,

550 U.S. at 556).

## I.    THE COMPLAINT STATES A CLAIM UNDER SECTION 523(a)(2)(A).

The Bankruptcy Code's fresh start policy "limits the opportunity for a completely

unencumbered new beginning to the 'honest but unfortunate debtor.'"  Grogan v. Garner,

16

498 U.S. 279, 286-87 (1991) (citing Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S. Ct. 695, 699, 78 L.Ed. 1230 (1934)).  Section 523(a)(2)(A), one of the most utilized of these provisions, prevents discharge of debts involving a debtor's dishonesty.

Most Section 523(a)(2)(A) adversaries brought to except debts on account of a debtor's fraud involve misrepresentations.  See McClellan v. Cantrell, 217 F.3d 890, 892-93 (7th Cir. 2000).  Consequently, the Tenth Circuit has held repeatedly to prevail on a claim for misrepresentation under Section 523(a)(2)(A), a creditor must prove the following elements: (i) the debtor made a false representation; (ii) the debtor made the representation with the intent to deceive the creditor; (iii) the creditor relied on the representation; (iv) the creditor's reliance was justifiable; and (v) the debtor's representation caused the creditor to sustain a loss.  Johnson v. Riebesell (In re Riebesell), 586 F.3d 782, 789 (10th Cir. 2009); Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1373 (10th Cir. 1996); Copper v. Lemke (In re Lemke), 423 B.R. 917, 921-22 (10th Cir. BAP 2010).

As Section 523(a)(2)(A) claims are based on fraud, Plaintiffs must meet the Rule 9(b) heightened pleading standard and "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b) (made applicable by Fed. R. Bankr. P. 7009).  However, while Rule 9(b) requires Plaintiffs to identify "'the circumstances constituting fraud'; it does not require 'any particularity in connection with an averment of intent, knowledge or condition of mind.'"  Danbom v. Prewitt (In re Prewitt), 486 B.R. 518, 523 (Bankr. D. N.M. 2013) (citing Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1252 (10th Cir. 1997).  "Simply stated, [the Amended Complaint] must set forth the time, place and contents of the false representation,

the identity of the party making the false statements and the consequences thereof." Prewitt, 486 B.R. at 523 (citing Schwartz, 124 F.3d at 1252).

Under this standard, the Amended Complaint states a plausible claim under Section 523(a)(2)(A) by setting forth the who, what, when and where of the misrepresentations, while at the same time pleading intent generally, thereby satisfying the standards of Fed. R. Bankr. P. 12(b)(6) as the following reflects:

Who: Defendant

What: Representations to Myers and MWSI to induce them to provide money to Defendant and Coil Chem, specifically:

(i) Defendant represented he and Coil Chem designed and tested a water treatment and clarification process that was a cost effective and reliable alternative to conventional, onsite water disposal and/or treatment processes then utilized in the industry, by providing a means to recycle water for later use in drilling and completion operations. After the Contract was executed, Defendant substituted the Kria Industrial Ionizer (dubbed a Super Oxidizer) claiming it was "better, faster and more profitable" than Coil Chem's existing systems. The Super Oxidizers, unknown to Plaintiffs, were not manufactured by Coil Chem.

(ii) Defendant represented the purchase price of the MWC Units as $510,836.19 per unit, but the price increased to $640,000.00 per unit after the Contract was executed.

(iii) Defendant represented the revenues being generated by Coil Chem for treating and clarifying "produced water" for use in Fracking operations on both the Samson Site and Brigham Site, came to "around $90,000.00 per month" and Plaintiffs could expect similar revenue for their well sites using the MWC Units. To substantiate these claims Defendant provided production and financial records that falsely represented the production capabilities and profitability of Super Oxidizers. However, the lease agreement for the first MWC Unit was generating only $19,000.00 per month.

When: Late 2015 to Spring 2017, with more specific dates provided within that time frame.

Where: In person and through modern communications.

The Amended Complaint provides, in detail, the actions taken by Myers and MWSI in reliance on the representations – entering into the Contract, forming MWSI, soliciting and obtaining investors in MWSI, and providing substantial sums of money to Defendant and Coil Chem to purchase the MWC Units. In short, Myers and MWSI claim Defendant made specific misrepresentations to them regarding his and Coil Chem's mobile water treatment system to induce them to invest then later purchase the systems. Further, they maintain Defendant knew these representations were false, Myers and MWSI relied on the misrepresentations, and the misrepresentations caused them damage. Sooner v. Keirns (In re Keirns), 628 B.R. 911, 919 (Bankr. S.D. Ohio 2021). The Amended Complaint's allegations are sufficiently detailed to provide Defendant with enough information to meaningfully defend the Amended Complaint, thus satisfying the heightened pleading standards for fraud-based claims. Keirns, 628 B.R. at 919.

Because the Amended Complaint sufficiently sets forth the who, what, when and where of the misrepresentation, the Amended Complaint states a plausible claim under Section 523(a)(2)(A), and the Motion is denied with respect to such claim.[5] Keirns, 628 B.R. at 919

---

[5]Defendant's Motion does not address whether Plaintiffs stated a claim under Section 523(a)(2)(A) for false pretenses or actual fraud. Regardless, the Court finds the Amended Complaint states a plausible claim for both given, based on the facts which must be accepted as true in the Motion, the existence of an apparent deliberate bait and switch followed up by a possible conversion of units and/or misappropriation of Myers' and MWSI's purchase price payments. Ray Klein, Inc. v. Webb (In re Call), 560 B.R. 814, 821 (Bankr. D. Utah 2016) (quoting Bank of Cordell v. Sturgeon (In re Sturgeon), 496 B.R. 215, 222-24 (10th Cir. BAP 2013)) ("[F]alse pretenses can be 'defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is

(continued...)

(citing <u>SFS Check, LLC v. First Bank of Del.</u>, 774 F.3d 351, 358 (6th Cir. 2014)).

**II.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 523(a)(4) BASED ON FRAUD OR DEFALCATION WHILE ACTING IN A FIDUCIARY CAPACITY BUT OTHERWISE STATES A CLAIM UNDER <u>SECTION 523(a)(4) FOR EMBEZZLEMENT OR FRAUD.</u>**

Pursuant to Section 523(a)(4), a debtor's discharge does not apply to debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  To state a claim under Section 523(a)(4) for fraud while acting in a fiduciary capacity, "a plaintiff must allege that:  (1) a fiduciary relationship existed between the debtor and the creditor, and (2) the debt owed to the creditor is attributable to a fraud or defalcation committed by the debtor in the course of the fiduciary relationship."  <u>Burton</u>, 2010 WL 3422584, at *5.  Defendant argues the Amended Complaint fails to state a claim under Section 523(a)(4) based on fraud or defalcation while acting in a fiduciary capacity.  The Court agrees.

Federal law determines the existence of a fiduciary relationship for purposes of Section 523(a)(4); however, state law is relevant to the inquiry.  <u>Young</u>, 91 F.3d at 1371.  This exception to discharge is a narrow one and, in the Tenth Circuit, an express or technical trust is required for a fiduciary relationship; neither a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties will give rise to a claim under Section 523(a)(4). <u>Young</u>, 91 F.3d at 1371-72.  Additionally, the trust creating the fiduciary capacity must have been expressly established or imposed prior to the alleged tortious action that created the debt.

---

<sup>5</sup>(...continued)
wrongfully induced to extend money or property to the debtor.'"); <u>Oklahoma Heritage Bank v. Ward (In re Ward)</u>, 589 B.R. 424, 428 (Bankr. W.D. Okla. 2018) (quoting <u>Husky Int'l Elecs., Inc. v. Ritz</u>, 578 U.S. 356, 359 (2016)) ("[T]he term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent transfer schemes, that can be effected without a false representation.").

Young, 91 F.3d at 1372. The Amended Complaint uses the term "fiduciary" but alleges only a general fiduciary relationship between Myers, MWSI, and Defendant, not an express or technical trust. Defendant is correct that a general fiduciary relationship is insufficient, and Plaintiffs seemingly concede the point by not identifying any allegations in the Amended Complaint establishing either an express or a technical trust. Accordingly, the Amended Complaint fails to state a claim for nondischargeability of debts pursuant to Section 523(a)(4) based on fraud or defalcation while acting in a fiduciary capacity.

However, the Court finds the Amended Complaint does state a claim for embezzlement or larceny under Section 523(a)(4). Both embezzlement and larceny have similar elements, with the essential difference being the manner in which property comes into the debtor's possession. Fleming Mfg. Co., Inc. v. Keogh (In re Keogh), 509 B.R. 915, 937 (Bankr. E.D. Mo. 2014). To state a claim for embezzlement, the Amended Complaint must allege "the fraudulent appropriation of property by a person to whom such property has been entrusted." Marks v. Hentges (In re Hentges), 373 B.R. 709, 723 (Bankr. N.D. Okla. 2007) (citing Klemens v. Wallace (In re Wallace), 840 F.2d 762, 765 (10th Cir. 1988)). On the other hand, "[l]arceny is proven for Section 523(a)(4) purposes if the debtor has wrongfully and with fraudulent intent taken property from its owner." Bombardier Capital, Inc. v. Tinkler (In re Tinkler), 311 B.R. 869, 876 (Bankr. D. Colo. 2004) (quoting Kaye v. Rose (In re Rose), 934 F.2d 901, 902 (7th Cir. 1991)); Chenaille v. Palilla (In re Palilla), 493 B.R. 248, 252 (Bankr. D. Colo. 2013).

The Amended Complaint alleges Plaintiffs advanced money to both Coil Chem and Defendant for the MWC Units, Defendant appropriated and misused either the advanced money or the MWC Units themselves after purchase, then cancelled the Contract, and wrongfully kept

the MWC Units and revenue generated by the MWC Units.  Such facts are sufficient to state a

claim under Section 523(a)(4) based on embezzlement or larceny.  Tinkler, 311 B.R. at 876.  As

a result, the Motion is denied as to Plaintiffs' Section 523(a)(4) claim with respect to

embezzlement and larceny.

III.    **THE COMPLAINT STATES A CLAIM UNDER SECTION 523(a)(6).**

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by

the debtor to another entity or to the property of another entity."  To prevail under Section

523(a)(6), a creditor must prove both a willful act and a malicious injury.  Panalis v. Moore

(In re Moore), 357 F.3d 1125, 1129 (10th Cir. 2004).  Thus, an intentional tort is required, and

debts resulting from recklessness or negligence are not within the scope of Section 523(a)(6).

Burton, 2010 WL 3422584, at *6 (citing Kawaauhau v. Geiger, 523 U.S. 57, 64 (1998)).

For an injury to be willful, there must be a deliberate or intentional injury, not merely a

deliberate or intentional action leading to an injury.  First Am. Title Ins. Co. v. Smith (Smith),

618 B.R. 901, 912 (citing Kawaauhau, 523 U.S. 57).  This description generally encompasses

intentional torts, which require the actor intend the consequences of his act and not simply the

act itself.  Smith, 618 B.R. at 912 (citing Kawaauhau, 523 U.S. at 61–62).  "A willful injury may

be established by direct evidence that the debtor acted with the specific intent to harm a creditor

or the creditor's property, or by indirect evidence that the debtor desired to cause the injury or

believed the injury was substantially certain to occur."  Smith, 618 B.R. at 912 (citing In re

Longley, 235 B.R 651, 657 (10th Cir. BAP 1999)).  The Tenth Circuit applies a subjective

standard in determining whether a debtor desired to cause injury or believed the injury was

substantially certain to occur.  Utah Behavior Serv. Inc. v. Bringhurst (In re Bringhurst), 569 B.R.

814, 823 (Bankr. D. Utah 2017) (citing Via Christi Regional Med. Ctr. v. Englehart (In re Englehart), 229 F.3d 1163 (10th Cir. 2000) (the willful and malicious injury exception focuses on the debtor's state of mind)).

For an injury to be malicious, the action must be wrongful and without justification or excuse.  Smith, 618 B.R. at 919-20.  "For a debtor's actions to be malicious, they have to be intentional, wrongful, and done without justification or excuse."  Gerlich v. Barwick (In re Barwick), 2021 WL 839079, at *5 (Bankr. W.D. Okla. 2021) (citing Bertone v. Wormington (In re Wormington), 555 B.R. 794, 800 (Bankr. W.D. Okla. 2016) (citations omitted)).  "'Malice may be implied where the preponderance of the evidence establishes that the debtor committed acts that were 'wrongful and without just cause.'"  Barwick, 2021 WL 839079, at *5 (citing AVB Bank v. Costigan (In re Costigan), 2017 WL 6759068, at *5 (Bankr. E.D. Okla. December 29, 2017) (citing Maxfield v. Jennings (In re Jennings), 670 F.3d 1329, 1334 (11th Cir. 2012))).

At this stage of the adversary proceeding, the Court finds the Amended Complaint sufficiently pleads a plausible claim under Section 523(a)(6) when the allegations of the Amended Complaint are taken as a whole.  Specifically, Plaintiffs allege Defendant and Coil Chem accepted funds from Plaintiffs to purchase the MWC Units, Defendant purchased them in part using Plaintiffs' funds but then failed to deliver lease proceeds under the Energen Contract for the first MWC Unit, using the revenues for Defendant's own use and/or to pay down loans used to acquire additional MWC Units for his own use.  It is difficult to conceive how Defendant could have intended anything but harm to Plaintiffs and/or Plaintiffs' property.  The Amended Complaint sets forth sufficient facts from which it can be inferred Defendant's actions were

taken intentionally and deliberately to injure Plaintiffs with the intent to cause such injury without any proper justification or excuse.  Smith, 618 B.R. at 912, 919-20.

Accordingly, the Amended Complaint states a plausible claim for relief under Section 523(a)(6) claim, and the Motion will be denied as to the Section 523(a)(6) claim.

## CONCLUSION

The Motion is GRANTED IN PART as to Plaintiffs' claim under Section 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity.  Otherwise, the Court has no doubt Defendant has been provided fair notice of the bases for the claims raised against him under Section 523(a)(2)(A), (a)(4) (embezzlement or larceny), and (a)(6) in the Amended Complaint. Accordingly, the Amended Complaint successfully states claims under Section 523(a)(2)(A), (a)(4) (embezzlement or larceny), and (a)(6), and the Motion is DENIED IN PART as to those claims.  Plaintiffs are directed to file a Third Amended Complaint to remove the allegations relating to a claim arising under Section 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity within fourteen (14) days after entry of this Order.

IT IS SO ORDERED.

# # #